On Rehearing.

Thomson, J.
Fred Z. Salomon died in November, 1888, the owner of two sections of land in El Paso county. On the 5th day of February, 1889, Adolph Z. Salomon and David H. Moffat, executors of his will, conveyed the entire property, except about thirteen acres theretofore granted to The Chicago, Rock Island & Pacific Railway Company, to Hyman Z. Salomon for an expressed consideration of $92,000, the receipt of which was acknowledged. The deed purported to he the execution of a power contained in the will. On the 9th day of February, 1889, Hyman Z. Salomon entered into a contract with Frederick L. Martin and Alvan A. McGovney, of which the following is a copy:
“Articles of agreement made this 9th day of February, in the year of our Lord one thousand eight hundred and eighty-nine, between Hyman Z. Salomon, of the city of Denver, county of Arapahoe, and state of Colorado, of the first part, and Frederick L. Martin and Alvan A. McGovney, of the city of Colorado Springs, in the county of El Paso, state of Colorado, of the second part, witnesseth:
‘ ‘ That the said party of the first part, for and in consideration of the sum of one hundred and twenty-two thousand three hundred and fifty-eight dollars ($122,358) to he fully paid as hereinafter mentioned, has contracted and agreed to sell to the said parties of the second part, all that certain piece or parcel of *62 land situate in the county of El Paso, state of Colorado, described as follows: All of sections numbered' four (4) and nine (9) in township numbered fourteen (14) south of range numbered sixty-six (66) west, except so much of section four (4) as was conveyed to The Chicago, Bock Island & Pacific Bail-way Company for right of way, being thirteen (13) acres more or less, in all twelve hundred' and twenty-three and fifty-eight one-hundredths (1,223 58-100) acres. And the said party of the first part agrees to execute deeds and contracts to the purchaser or purchasers of parcels of the aforesaid tract of land, and shall hold securities hereinafter mentioned, arising from said sales until he has been fully paid the purchase price of said land, and the payments on said land to be as follows: Eleven thousand one hundred and seventy-nine dollars ($11,179) cash, and eleven thousand one hundred and seventy-nine dollars ($11,179) to be paid on April 15, 1889, and the further sums of ten thousand dollars ($10,000) to be paid on July 1, 1889, ten thousand dollars ($10,000) on January 1,1890, and on each succeeding July and January the sum of ten thousand dollars ($10,000) until January 1, 1894, at which time the said sum of one hundred thousand dollars ($100,000) shall have been paid. And the said parties of the second part, for themselves, their heirs, executors and administrators, do agree to and with the said party of the first part, his heirs and assigns that the said parties of the second part will pay the said several sums as they severally become due with interest thereon; that said parties of the second part are to have the control and handling of said property, and expend a sum not to exceed twenty thousand dollars ($20,000) in platting said grounds, grading streets, introducing water through pipes and ditches, also to assist in bringing a street railway from the center of the *63 said city of Colorado Springs, county and state aforesaid, to the said land; all such expense to be deducted from the first sales of said land or parcels thereof; and the said expense shall be divided as follows: The parties of the second part to pay two-thirds and the party of the first part one-third; provided, however, that the proceeds arising from the sales of said land after the payment of the expenses as aforesaid, and the payment of the land at the purchase price of one hundred dollars ($100) per acre, the surplus then remaining shall be divided as follows : One-third to the party of the first part, and two-thirds to the parties of the second part. And it is further agreed by and between the parties to these presents that if default be made in fulfilling this agreement in that any of the payments therein mentioned should not be paid in six months after by the terms of this contract required to be paid by the parties of the second part, then the said party of the first part, his heirs and assigns, shall be at liberty to consider this contract as forfeited and annulled, and to dispose of said land to any other person in the same manner as if this contract had never been made.
“In witness whereof they have hereunto set their hands and seals the day and year above written.
“Hyman Z. Salomon.
“Frederick L. Martin.
“A. A. McGovney.
“Signed and delivered in presence of E. H. Wilson.”
On the 6th day of August, 1889, Moffat resigned, leaving Adolph Z. Salomon the sole executor. Shortly afterwards, Hyman Z. Salomon, at the request of Martin and McGovney, conveyed undivided interests in the north half of section 9 to a number of persons, those interests aggregating thirty-one fortieths of the one-half section. A corporation was then organized, *64 called The Grand View Addition Company, with a capitalization of six thousand shares of a par value of $50 each. The incorporators were Martin, McGovney and Frank White, and the same parties with Edgar G. Dean and John Dewitt Peltz were named as directors. The persons to whom Hyman Z. Salomon had made deeds, conveyed their interests, amounting in all, as has been said, to thirty-one undivided fortieths, to The Grand View Company, in consideration of stock of the corporation issued to them; and Hyman Z. Salomon then conveyed the remaining nine-fortieths to it. On the 12th day of January, 1889, Hyman Z. Salomon, at the request of Martin and McGovney, conveyed the south half of section 9 to The Colorado Springs Improvement Company, receiving for the property nine promissory notes of that company, eight for $5,000 each, and one for $8,000; all secured by a trust deed on the land. These notes were delivered to Hyman Z. Salomon, and accepted by him in lieu and satisfaction of $48,000 of the indebtedness of Martin and McGovney to him. On the 29th day of July, 1895, Hyman Z. Salomon transferred to Adolph Z. Salomon the agreement and promissory notes of Martin and McGovney; and on the 21st day of April, 1896, executed to him a deed of conveyance of sections 4 and 9. The agreement and notes were transferred, and the deed executed, as collateral security for the unpaid balance of the consideration of the conveyance from the executors to Hyman. On the 22d day of February, 1890, The Grand View Addition Company and The Colorado Springs Improvement Company, filed in the office of the county clerk a plat subdividing a large portion of section 9 into lots and blocks, making two additions to the city of Colorado Springs. On the 16th day of February, 1896, McGovney died intestate.
The evidence leaves it uncertain what amount *65 of the $92,000 named as the consideration in the deed from the executors to Hyman Z. Salomon, had been paid by him; but, according to the recollection of Judge Wells, who, as attorney, had conducted some of the transactions between the parties, it did not exceed $26,000.
This action was brought by Adolph Z. Salomon to obtain a decree declaring and enforcing a vendor’s lien in his favor upon the whole of section 4, and upon the lots and blocks in The Grand View Company’s addition, which had not been sold by the company. This lien was claimed by the executor as assignee and grantee of Hyman Z. Salomon. Judgment was also prayed against Martin and the administratrix of McGovney for the amount due upon the notes of Martin and McGovney to Hyman Z., which had been assigned to the plaintiff. All the persons whose presence was necessary for the purpose of the desired decree and judgment, were made parties defendant. Certain judgment creditors of Hyman Z. Salomon, whose judgments were allowed to be subject and subordinate to his lien, were also made parties defendant.
Where one person conveys real estate to another in such manner that the legal title vests in the latter, and the consideration of the sale is not paid or secured, equity allows the grantor a lien upon the land for its payment. In this case the plaintiff asserts no right to a lien for the unpaid consideration of the conveyance from the executors to Hyman Z. Salomon. His claim is that by virtue of the transfers to him of the agreement and notes of Martin and McGovney, and the execution of the deed to him for the two sections of land, including the lots and blocks, he has succeeded to the rights of Hyman Z., and is entitled to the enforcement of a lien which he alleges existed in favor of the latter upon section 4, *66 and the unsold lots and blocks in The Grand View Addition, for the amount due on the notes of Martin and McGovney.
By the transfers and conveyance, the plaintiff took what Hyman Z. was able to give, and no more; and what that was, must he determined from the contract which the latter entered into with Martin and McGovney. That contract was not a contract for the sale of the land. It is true it styled itself an agreement to sell, and calls the consideration to be paid, “purchase price”; but from an examination of its terms and conditions, by which alone its character may he fixed, it conclusively appears that a sale of the real estate by Hyman to Martin and McGovney was not within the contemplation of the parties; and that the “purchase price” was not a consideration to he paid for the land. The purpose of a sale is to transfer title. The ownership of property sold, passes from the vendor to the vendee. But there is no provision in this contract by compliance with which Martin and McGovney could ever become the owners of the land. To the contrary, express provision is made for the conveyance of the land to other persons. What Martin and McGovney acquired by virtue of the contract, was not the right to become owners of the land, or of any interest in the land, hut the right, using the language of the contract, to “have control and handling” of the land; and the right to retain two-thirds of the net proceeds of the sales, accounting for the remaining third to Hyman. What the contract calls ‘ ‘ purchase price ’ ’ was simply the consideration to be paid by them for the right to control and handle the land, and for an interest in the proceeds of sales. On his párt, Hyman hound himself to execute deeds to the purchasers.
For the payment of Martin and McGovney’s *67 notes, Hyman must have relied on their personal responsibility, and on the securities mentioned in the contract, whatever they may have been. All the parties were to operate together; the former were, to make sales; the latter was to execute deeds; and the proceeds were to he divided equally among the three. As the money realized from sales belonged to them all, there could be no lien in favor of Hyman alone, for the unpaid price of a lot or parcel sold by Martin and McGovney. Whether the purchasers had knowledge of the relations between Hyman and Martin and McGovney, or what was the effect of their knowledge upon their purchases, is not properly in question. When deeds were executed to them they were bound to know that the title was not in Martin and McGovney; and they were chargeable with knowledge of everything else to which that knowledge might lead. But this is not a case in which what they knew or did not know, or what they might or might not have known, is of any importance. If they had read and carefully studied the entire contract, they would simply have learned that Martin and McGovney were in control of the property, and could he safely dealt with; and that upon purchase from the latter and payment to them of the purchase money, a conveyance of the property purchased could be compelled.
The relations existing between Hyman and Martin and McGovney; the authority with which he had clothed them; the obligation he had assumed to honor their contracts by a transfer of the legal title; and the fact that they were, jointly with him, interested in the money arising from sales; were incompatible with a supposition of vendor’s liens in his favor upon any land purchased from them and conveyed by him.
So far as section 4 is concerned, at the time Hy *68 man executed his deed to the plaintiff, the legal title to the whole was in him. No part of it had been sold. It was embraced in the contract with Martin and McGovney, but they had never disturbed it. He had no lien upon it, for he had never sold it, or contracted to sell it; and the title, both legal and equitable, remained constantly in him. But while he was its owner, judgments were recovered against him, and the liens of the judgments attached to the land. His conveyance to the plaintiff was subject to those liens, and until discharged, they will remain an incumbrance upon the title.
The contract with Martin and McGovney provided that upon default by them in any of their payments for six months, the contract might be regarded as annulled, and a right would vest in Hyman to dispose of the land to any other person, as if the contract had never been made. They were in default for more than six months. By his deed to the plaintiff, Hyman elected to annul the contract; he exercised a right which that instrument, in express terms, conferred upon him; and the plaintiff took the title discharged from any burden which the contract might otherwise have imposed.
The transfers and conveyance to the plaintiff did not constitute an assignment of a vendor’s lien, for the simple reason that there was none to assign. With the agreement and notes of Martin and Mc-Govney, he took the remedies upon them of his assignor ; and with the deed from Hyman, he took the titlej subject to the judgment liens, as security which he could enforce in a proper proceeding,. for what Hyman owed him. But he took nothing else; and in so far as he seeks the enforcement of a vendor’s lien, his suit must fail.
The question whether, notwithstanding a vendor’s lien was not established, the plaintiff was en *69 titled to a personal judgment upon the notes, has been withdrawn from the case. In the oral argument upon the rehearing, counsel for the plaintiff expressly disclaimed all right to such judgment apart from the lien, and conceded that if there was no lien, there could be no judgment. In our opinion there was no lien, and the judgment below must he affirmed.

Affirmed